IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re: | : | |
| ERIE COUNTY PLASTICS CORPORATION, | : : | Case No. 08-11860-TPA Chapter 11 |
| *Debtor* | : | |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS | : : | Adversary No. 09-1068 |
| *Plaintiff* | : : | Related to Document No. 68 |
| v. | : : | |
| THE DOW CHEMICAL CO. | : | |
| *Defendant* | : | |

# MEMORANDUM OPINION and ORDER

On September 29, 2008, Erie County Plastics Corp. ("Debtor") filed a voluntary Petition under Chapter 11 of the *Bankruptcy Code*. By Order dated July 28, 2009, The Debtor's Chapter 11 *Plan of Orderly Liquidation* was confirmed. The *Plan* vested the right to pursue preference litigation with the Creditors' Committee ("Committee"). As a result of the foregoing, on July 29, 2009, the Committee commenced this action against The Dow Chemical Company ("Dow") by filing its *Complaint to Avoid and Recover Preferential and/or Fraudulent Transfers Pursuant to 11 U.S.C. §§547, 548, 549, and 550.* On October 20, 2010, argument on the second ***Motion for Summary Judgment*** filed by the Committee at Document No. 68 ("Motion") took place. For the following reasons, the *Motion* will be denied.[1]

---

[1] The Court's jurisdiction under *28 U.S.C. §§157* and *1334* was not at issue. This is a core proceeding pursuant to *28 U.S.C. §§157(b)(2)(F)* and *(H)*.

## FACTS

In the *Motion,* the Committee seeks summary judgment as to $420,000 in payments made by the Debtor to Dow during the preference period plus interest from the date of each transfer. The payments were paid pursuant to a payment plan designed to enable the Debtor to continue to make purchases from Dow on a "cash in advance" or "cash on delivery" basis while at the same time make weekly payments on the past-due, unpaid invoices. Dow was one of the Debtor's major suppliers.

By May, 2008, the Debtor was delinquent on paying Dow's invoices and an outstanding balance of over $1,000,000 had accumulated. This is when the Debtor and Dow agreed upon a payment plan. During the ninety day period immediately prior to the bankruptcy filing, the Debtor made twelve payments of $35,000 each to Dow pursuant to the payment plan, for a total of $420,000. The plan is summarized in the addendum to Proof of Claim No. 239 filed by Dow on February 9, 2009. It states in relevant part:

> "Dow sold goods to Debtor and invoiced Debtor accordingly. On or about May 29, 2008, Dow accelerated the payment on all outstanding invoices, the Debtor and Dow agreed that the Debtor would pay such invoices in the ordinary course of business in accordance with a payment plan, and Dow agreed to continue to sell goods to the Debtor on cash with order basis. Pursuant to the payment plan, Debtor generally agreed to make weekly payments of $35,000 on account of its past due invoices...."

*See Claims Register*, Claim No. 239

In opposition to the *Motion,* Dow claims the existence of a number of material factual issues which militate against the grant of summary judgment, including:

  (1) The solvency of the Debtor.
  (2) The applicability of the ordinary course of business defense to the facts.
  (3) Entitlement to interest on any judgment
  (4) Whether the action is of any benefit to unsecured creditors.

Dow posits that since both it and the Debtor entered into similar arrangements with other entities, and since such actions are typical in the industry when working with delinquent accounts, it qualifies for the "ordinary course of business" defense. The record reflects that the Debtor did enter into similar arrangements with many of its major trade suppliers. The repayment plans typically provided for the supplier to continue selling products to the Debtor, with the Debtor paying cash in advance for current orders plus an additional amount for application to past due invoices.

## DISCUSSION

*Ordinary Course of Business Defense*

Dow first claims that summary judgment is not appropriate since a genuine and material factual dispute exists in regards to the "ordinary course of business" affirmative defense it has raised. *11 U.S.C. §547(c)(2)*. Under this section of the *Bankruptcy Code*, an otherwise preferential transfer may not be avoided if the transfer was made in the ordinary course of business of the debtor and the transferee or made according to ordinary business terms. The key issue for determination of whether the ordinary course of business defense applies is whether the comparison is the "ordinary course of business" between the Debtor and Dow to similarly situated, i.e., financially troubled businesses, or whether the comparison is to the ordinary course of dealing between financially healthy suppliers and financially healthy customers.

3

It is Dow's contention that the relationship between it and the Debtor must be compared to other relationships for similarly situated entities. Dow is prepared to present evidence that, in the ordinary course of business, it, as well as other suppliers in the industry, treat other customers similar to the Debtor, who have large balances that they are unable to pay on a current basis, similarly to its treatment of the Debtor in this case, i.e., continue to make shipment of product on a cash on delivery basis or cash in advance basis while requiring payments on the delinquent balance. Also in support of its "ordinary course" defense, Dow points to the fact that the Debtor made similar arrangements with most of its major suppliers. Dow claims that this is a typical, ordinary course, scenario for a company in financial trouble.

The Committee counters that the ordinary course of business exception requires application of the "healthy-debtor" standard whereby ordinary business terms are those used in a normal financing relationship; the kind of terms creditors and debtors use in ordinary circumstances when debtors are healthy.

A number of cases from other circuits support Dow's position. *In re U.S.A. Inns of Eureka Springs, Ark., Inc.*, 9 F.3d 680, 685-86 (8th Cir. 1993). (§547(c)(2)(C) satisfied by evidence that it was common industry practice to work with a troubled debtor if it remitted some form of payment); *In re Roblin Indus., Inc.*, 78 F.3d 30, 42 (2d Cir. 1996), ("If the terms in question are ordinary for industry participants under financial distress, then that is ordinary for the industry."); *In re Jan Weilert RV, Inc., 315 F.3d 1192* (9th Cir. 2003) (following *Roblin*).

Other courts employ a "healthy debtor" standard. *In re Meridith Hoffman Partners*, 12 F.3d 1549, 1553 (10th Cir. 1994) ("Ordinary business terms therefore are those used in 'normal

financing relations'; the kinds of terms that creditors and debtors use in ordinary circumstances, when debtors are healthy.")  The Court of Appeals for the Third Circuit follows this approach. "Ordinary terms are those which prevail in healthy, not moribund, creditor-debtor relationships." *In re Molded Acoustical Prods.*, 18 F.3d 217, 227 (3rd Cir. 1994).  (The preference defendant compared its terms to the debtor with two of its other customers who "were delinquent in their payments and that both eventually filed for bankruptcy.  The Court states that "[t]hese facts standing alone undermine any claim that Fiber Lite's credit terms with [those companies] were 'ordinary.'")

As to the ordinary course of business between the two parties, the Third Circuit addressed this issue in *In re Hechinger Inv. Co. of Delaware, Inc.*, 489 F.3d 568 (3d Cir. 2007). There the court stated that "each fact pattern must be examined to assess 'ordinariness' in the context of the relationship of the parties over time." *Id*. at 576-77.  This test has been referred to as the "sliding scale" approach.  In *Hechinger*, it was not the ordinary course of business between the parties where "a month before the beginning of the preference period, [the supplier] tightened its credit terms, imposed a credit limit, required [the debtor] to make payments by wire transfer in large, lump-sum amounts, and required [the debtor] to send remittance advices after making payment on invoices." *Id*. at 578.  *See also In re Global Tissue, L.L.C.,* 106 Fed. Appx. 99 (3d Cir. 2004) (Payments, while slightly accelerated, were made within range established by parties' prior dealings were made in the ordinary course of business).

In this case, it appears that the terms between the parties significantly changed just prior to the preference period and that these preferential transfers would not be protected by the safe harbor provisions of the ordinary course of dealings defense either between the parties or in

5

comparison to the industry standards under either the Third Circuit's "healthy, not moribund" or "sliding scale" standards. Dow claims that the Debtor was not "moribund" (being in a state of dying; approaching death; at death's door) at the time of the transactions and offers a degree of expert opinion in support thereof.

In determining the existence of a genuine dispute as to a material fact and resolving all inferences in favor of Dow, the Court agrees that a factual question does arise. Therefore, Dow must be afforded an opportunity to present its evidence. Although it appears that Dow may have difficulty at trial defeating the preference claim with differing standards of proof at play, for purposes of summary judgment, only, the *Motion* must be denied.

*Presumption of Insolvency*

*Section 547(b)(3)* of the *Bankruptcy Code* requires the Committee to establish that the Debtor was insolvent at the time of the alleged transfers. *11 U.S.C. §547(b)(3)*. While a debtor is presumed insolvent during the ninety days prior to the filing, *Section 547(f)*, the presumption of insolvency, is rebuttable.

A debtor is insolvent when "the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." *11 U.S.C. §101(32)(A)*. Here, the Debtor asserts that on September 29, 2008, at the time of the bankruptcy filing, it had assets worth $9,072,221 and liabilities of $24,627,450 and that on the dates of the transfers at issue, as stated in the *Affidavit* of its principal, the financial condition was substantially similar.

As to the issue of solvency Dow points to:

(1) The Debtor's 2008 tax return which reflects assets of $37,772,577 and liabilities of $37,793,335;

(2) A September, 2007 expression of interest regarding the purchase of the stock of the Debtor and an affiliate for a gross purchase price of $55 to $60 million;

(3) A May 16, 2008 statement by the Debtor's representative that April was a "good month" since the Debtor made money and had a strong EBITDA;

(4) Statements by the Debtor's representatives in May, 2008 that a sale or equity infusion would be accomplished and that the company would remain viable;

(5) A May 30, 2008 letter of intent regarding the acquisition of 100% of the shareholder interests;

(6) A statement that the Proctor & Gamble contract did not cease until July;

(7) The fact that the Debtor's President described the difficulties as "sudden" and "unexpected".; and

(8) Statements made by the Debtor's representatives in early August indicating that a sale of the company would occur in the end of August.

Looking solely at the foregoing representations, point by point, it does not appear that Dow will ultimately be successful at trial in its attempt to show that the Debtor was solvent since:

(1) The statement of values in the tax return represents book value which has nothing to do with actual value and is as of a date months prior to the alleged preference payments;

(2) The September, 2007 expression of interest at a value of $55-60 million,

  (a) did not culminate in a sale,
  (b) was prior to the loss of nearly half of the Debtor's business when Proctor & Gamble ceased doing business with the Debtor,
  (c) is months prior to the alleged preference payments.

(3) The May 16, 2008 statement by Thomas Von Lehman also states, "I do not have all the expenses of a bankruptcy, if this is what occurs" and also makes speculative assumptions that the union will accept a wage cut and a reduced health care plan;

(4) The sale or equity infusion were mere speculation and did not occur;

(5) The May 30, 2008 letter of intent provided for assumption of the senior debt and a 15% equity interest. It was dependent on the senior debt holder agreeing to terms consistent with the cash flow requirements of the business and provided further that "to the extent it is necessary in order to complete a transaction that the Company declare bankruptcy under Sec. 363, then [buyer] would be granted Stalking Horse status ….";

(6) The statement referred to that the Proctor & Gamble account did not cease until July, actually states "Prior to July 2008 when the Debtor's largest customer, Procter & Gamble ceased doing business with the Debtor, the Debtor had annual sales of approximately $88 million. With the departure of Procter & Gamble, the Debtor's annual sales were reduced to approximately $41 million." This statement is taken from the Declaration of a representative of JP Morgan Chase Bank in opposition to the use of cash collateral. The next paragraph of the Declaration, ¶8 informs that the Lenders and the Debtor entered into an initial forbearance agreement on April 30, 2008 and that the Debtor was in default at that time. It also states that for almost a year prior to the bankruptcy, the Debtor, with the assistance of two separate investment banking firms, extensively marketed the Debtor's business and assets for sale without success;

(7) The Affidavit of P.C. Roche, the Debtor's CEO states at ¶3 in its entirety that "Debtor's Bankruptcy Filing was the result of severe sudden and unexpected distress and several unsuccessful attempts to sell the Debtor's business as a going

        concern." There is no explanation of what "sudden and unexpected" means, but one could surmise that it had to do with the loss of the Procter and Gamble account.; and,

(8) While the representatives of the Debtor may have stated at the beginning of August that a sale would occur at the end of August, that statement was speculative, no sale in fact occurred and there is no indication that those representatives had any indication of the price or terms at which such sale might occur. Finally, the actual sale of price of the Debtor's assets is the best gauge of value. After a significant period of time both prior to and following the Bankruptcy filing spent attempting to locate a buyer, the Debtor's assets sold for far less than the amount of the senior debt and except for a $150,000 carve out all proceeds were paid to the Lenders.

Although it appears that at trial Dow will struggle to rebut the presumption of insolvency, for purposes of summary judgment, Dow has pointed to sufficient evidence to cast into doubt the statutory presumption of insolvency. As such, for present purposes only, resolving all fair inferences in favor of the non-moving party, as we must in considering a motion for summary judgment, the Court is required to deny the Committee's *Motion* in this regard.

*Prejudgment Interest*

The Creditors' Committee also seeks an award of prejudgment interest. This is addressed by the Court of Appeals for the Third Circuit in *Hechinger*. In a preference action, prejudgment interest should be awarded unless there is a sound reason not to do so. *Id.* at 579-80.

## **ORDER**

*AND NOW*, this *3rd* day of *November, 2010*, for all of the foregoing reasons, it is **ORDERED, ADJUDGED and DECREED** that the *Motion for Summary Judgment* filed by the Official Committee of Unsecured Creditors at Document No. 68 is **DENIED**.

/s/ Thomas P. Agresti
Thomas P. Agresti, Chief Judge
United States Bankruptcy Court

Case Administrator to serve:
    Scott E. Schuster, Esq.
    Martin J. Weis, Esq.
    Lawrence C. Bolla, Esq.